UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WENDY SIMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:09CV1340 TIA |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On April 30, 2007, Plaintiff filed applications for Disability Insurance Benefits (DIB) and for Supplemental Security Income (SSI), alleging disability beginning March 1, 2006. (Tr. 67-74) Plaintiff's applications were denied on July 23, 2007, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 35-42, 45) On September 9, 2008, Plaintiff appeared and testified at hearing before an ALJ. (Tr. 17-34) In a decision dated October 30, 2008, the ALJ determined that Plaintiff was not under a disability from March 1, 2006 through the date of the decision. (Tr. 8-16) On June 22, 2009, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff testified that she lived in a house with her mother, two brothers, and 23-year-old son. She had a 12th grade education, along with some training in business applications. Plaintiff previously worked in a loan processor department, preparing information for insurance mortgage loans, and automatic house and car payments. Plaintiff also worked in data entry at Kelly Services and as a receptionist, data entry worker, and coin checker at West Staff. In addition, Plaintiff was self-employed in 1994, when she babysat from her home. In 2000 or 2001, Plaintiff worked for the postal service as a flat sorter operator. Plaintiff performed a lot of lifting and feeding into machines which led to back problems and worker's compensation. In 2004, Plaintiff attended vocational training and took Business English, Math, and Microsoft Office. (Tr. 19-23)

Plaintiff testified that her medical problems included depression and anxiety; pain from arthritis and sciatic nerve; and daily numbness in her arm. She underwent tests to determine the cause of the numbness. However, the doctors were unable to determine the source or give a diagnosis regarding these symptoms. Plaintiff stated that she weighed 225 pounds, which was down from 252 pounds. Her diagnosed physical impairments included asthma, allergies, and Diabetes. Plaintiff took Pulmicort, an inhalent, and Albuterol for her asthma. With regard to her Diabetes, Plaintiff took Metformin and Glipizide. Dr. Slaven treated Plaintiff for these conditions. (Tr. 24-26)

In addition, Plaintiff had been diagnosed with anxiety and depression. She first saw Dr. Flynn for a year and was currently treated by Dr. Lutchineck. However, she testified that she only saw Dr. Lutchineck on one occasion. For over a year, Plaintiff attended therapy sessions with Dr. Taylor every two weeks. Although Dr. Taylor submitted an evaluation, the ALJ left open the record for Dr.

Taylor to provide clinical records to support her evaluation. With regard to Dr. Flynn, Plaintiff testified that she received services from Dr. Flynn for a year and that her last appointment was in June of 2008. Plaintiff was hospitalized in 2000, and after her release, she attended daily outpatient therapy for months. Plaintiff's medications for her psychological problems included Citalopram, Clonozepam, and Trazodone. Plaintiff had been taking Trazodone for insomnia over the past 5 months. However, she had taken the other medications for over a year. (Tr. 26-30)

During a typical day, Plaintiff mostly stayed in her bedroom and watched television. She occasionally did the dishes, helped clean the living room, and helped in the garden. She sometimes sat outside. However, she testified that even on beautiful days, she couldn't make herself go outside, even though she wanted to. Plaintiff stated that she had battled depression since 2000 and that the things she needed to do were the hardest to accomplish. She attended Christian meetings at least 3 times a week for encouragement and strength. She also went for walks and to concerts at the park. However, Plaintiff testified that when she socialized, she just wanted to be at home in her room. Plaintiff also volunteered as a Jehovah's Witness, going door to door. (Tr. 30-31)

With regard to walking, Plaintiff stated that she could walk anywhere from 2 to 6 blocks, depending on how bad her knee or hip hurt. She alternated between sitting and laying down while watching TV. She could stand for no more than ½ hour, and she could lift a maximum of 10 pounds. Her brother or son lifted heavy objects, including groceries. Plaintiff testified that her had hurt if she tried to lift anything heavy. Plaintiff bathed 4 to 5 times a week and stayed in her pajamas all day. She had problems holding onto things with her hand, so buttoning, combing her hair, and opening containers caused problems. Her sleep improved since taking the Trazadone; however, she was drowsy and incoherent during the day. She took pain medication for the nerve pain and numbness

3

in her arms. When talking on the phone, Plaintiff needed to switch hands every 5 minutes due to numbness. At the end of the hearing, the ALJ noted that she was leaving the record open to submit additional medical records that were missing during the hearing. (Tr. 31-33)

In a Disability Report – Adult, Plaintiff listed her impairments as depression, hbp, diabetes, sleep apnea, asthma, lupus, rheumatoid arthritis, and connective tissue disorder. She reported that she was unable to concentrate, focus, or deal with stress. She cried frequently and was in much pain all of the time. (Tr. 113-14)

### III. Medical Evidence

On July 19, 2005, an x-ray of Plaintiff's lumbar spine revealed mild disc disease, particularly at L4-5 and S1, along with osteoarthritis in the facet joints, especially at L5-S1. Dr. Chandrakant C. Tailor assessed degenerative disease of the lower lumbar spine. (Tr. 207) On January 27, 2006, Dr. Peggy Boyd Taylor noted Plaintiff's Diabetes and depression. On February 9, 2006, Dr. Taylor prescribed Wellbutrin, Lexapro, and Glipizide. (Tr. 170)

On March 20, 2006, Plaintiff complained of hypertension, heart palpitations, and a burning and prickly sensation in all extremities. The physical examination was normal, and the diagnoses included Hypertension; Type II Diabetes Mellitus, controlled; joint pain involving multiple sites; Hyperlipidemia; and obesity. Dr. Esther F. Adade referred Plaintiff to rheumatology. (Tr. 179-81)

On June 20, 2006, Plaintiff was seen at Saint Louis ConnectCare for a polyarthralgias consultation. Plaintiff complained of lower back pain and knee pain. Past medical history included Type II Diabetes Mellitus; Hypertension; Depression; high cholesterol; and asthma. (Tr. 227)

On September 18, 2006, Plaintiff was seen at the Saint Louis County Department of Health, North Central Community Health Center, for diabetic care. Plaintiff's physical examination was

4

normal, and Dr. Adade noted that Plaintiff's Diabetes was controlled without mention of complication. Dr. Adade advised Plaintiff to walk 20 to 30 minutes a day to combat obesity. (Tr. 176-78) Plaintiff returned to the Saint Louis County Department of Health, North Central Community Health Center, on May 8, 2007 to get a referral to a rheumatoid doctor and refill her prescriptions. Plaintiff also reported joint pain in the shoulder, knees, ankles, and elbows. In addition, Plaintiff complained of employment problems and anxiety due to financial stressors. She was having trouble concentrating since discontinuing Wellbutrin and Lexapro 3 or 4 months prior. Depression was not present. Plaintiff had an appointment with a psychiatrist on May 21, 2007. Plaintiff's physical examination was normal. Her neuropsychiatric examination revealed an anxious mood and affect. Her associations were intact, and she displayed appropriate judgment regarding everyday activities. Dr. Shirley A. Marshall referred Plaintiff to St. Louis ConnectCare Rheumatology and prescribed Lexapro for Depressive Disorder, Not Elsewhere Classified. (Tr. 172-75)

On May 17, 2007, Dr. Zarmeena Ali examined Plaintiff at Saint Louis ConnectCare during a follow-up visit for arthritis. Plaintiff reported pain in her right shoulder and both knees. In addition, her right arm swelled up a few times over the past few weeks. Plaintiff also complained of rashes that could be related to Lupus and numbness in her right hand at night. Dr. Ali noted that Plaintiff mentioned that she was unable to hold a job and filed for disability. Plaintiff also complained of paresthesias in her hands bilaterally. Further, extensive evaluation at Washington University showed no connective tissue etiology. She reported past suicidal ideation in the past and was doing better after moving in with her mother. She attributed her inability to hold a job to depression. After a physical examination, Dr. Ali assessed osteoarthritis. Her mental status exam revealed an anxious and tearful mood. Dr. Ali also noted that Plaintiff had a longstanding history of ANA (antinuclear

5

antibody test) positive but no exam or history suggesting connective tissue disease. Dr. Ali opined that depression was the possible etiology for her diffuse complaints. In addition, Dr. Ali did not believe that Plaintiff could hold a job due to severe mood instability. Plaintiff's arthritis was under control with naprosyn and flexeril. Dr. Ali opined that Plaintiff may have compressive ulnar neuropathy and advised Plaintiff to keep her arm extended at night for 6 weeks. Dr. Ali further stated that Plaintiff needed aggressive control of her depression. (Tr. 211-14)

Plaintiff underwent an Adult Psychiatric Evaluation on May 21, 2007 at Jewish Family and Children's Services. Plaintiff complained of depression and reported being diagnosed with depression in 1999 or 2000 and being hospitalized for depression in 2000. During the Mental Status Exam, Plaintiff's mood was depressed, and her affect was dysphoric. She denied suicidal or homicidal ideation and had no delusions. Her thought processes were logical, and her insight and judgment were good. Plaintiff was oriented x3. Plaintiff's diagnoses were Major Depressive Disorder, recurrent and without psychosis; limited formal education and getting fired from jobs; and a GAF of 40. Attending Notes indicated that Plaintiff's depression started in high school and had worsened. She had hypersomnia, hopelessness, worthlessness, decreased concentration, and suicidal thoughts. During the interview, Plaintiff was well-groomed yet tearful, and she maintained good eye contact. (Tr. 235-38)

Plaintiff returned to Jewish Family and Children's Services on June 18, 2007 after she had failed to refill her prescriptions. Plaintiff was mildly tearful during the session. She reported hypersomia, decreased energy, intermittently impaired concentration and memory, and poor appetite. She also stated that she had occasional nightmares and intrusive memories regarding physical abuse. The examiner noted that Plaintiff's condition remained the same and that stressors included

6

interpersonal relationships with her family members. Plaintiff's mood was sad, but the remainder of her mental exam appeared normal. The examiner assessed major depressive disorder, recurrent, severe, without psychosis. Plaintiff was to continue her medications, which included Lexapro and Klonopin. (Tr. 234)

James Spence, Ph.D., completed a Psychiatric Review Technique form on July 19, 2007. Dr. Spence assessed Affective Disorder, stating that Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria for other affective disorders. Dr. Spence rated Plaintiff's degree of functional limitation as "mild" for activities of daily living and maintaining social functioning and "moderate" for maintaining concentration, persistence, or pace. She had no repeated episodes of decompensation of extended duration. With regard to a Mental Residual Functional Capacity Assessment completed on that same date, Dr. Spence opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; and maintain attention and concentration for extended periods. She was not significantly limited in any other areas. Dr. Spence noted Plaintiff's sporadic treatment for depression. He also noted that he did not give the psychiatric evaluation from Jewish Family and Children's Services much weight, as the one-time evaluation was insufficient to support the opinion that Plaintiff was unable to hold employment due to severe depression. Instead, Dr. Spence concluded that Plaintiff retained the capacity to complete simple, repetitive tasks on a sustained basis. In addition, Plaintiff's social skills were adequate for her to appropriately relate to supervisors and co-workers. Her allegations of depression were only partially credible. (Tr. 240-53)

On July 20, 2007, Plaintiff called Saint Louis ConnectCare to report that she had done well on naprosyn twice a day and to request refills. Plaintiff stated that she experienced intermittent

symptoms of arthritis and that Flexeril did not work. (Tr. 294)

On July 23, 2007, P. Gerlach completed a Physical Residual Functional Capacity Assessment. Dr. Gerlach determined that Plaintiff could lift 20 pounds occasionally and less than 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull in an unlimited capacity. Further, Plaintiff could only occasionally climb ladder/rope/scaffolds, stoop, kneel, crouch, and crawl. She had no manipulative. visual, or communicative limitations, but she needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 255-60)

Plaintiff returned to Jewish Family and Children's Services on August 9, 2007 for treatment of depression. Plaintiff reported that her depression was improving and that she experienced fewer crying spells. She had switched from Lexapro to Celexa. The assessment included Major Depressive Disorder, recurrent, severe without psychosis and anxiety. (Tr. 264) On October 11, 2007, Plaintiff stated that her depressed mood continued to improve. Her Major Depressive Disorder was in partial remission, and her anxiety was well-controlled. (Tr. 263)

On December 7, 2007, Plaintiff attended a follow-up appointment at Saint Louis ConnectCare. She complained of pain at a level of 6 out of 10. Dr. Ali noted that Plaintiff was last seen in May of 2007 and that no etiology was determined for her diffuse polyarthralgias. Plaintiff specifically complained of pain in her right shoulder and numbness in her right hand since July, 2007. She also stated that she had pain in her right arm when laying on it. In addition, she had neck and upper shoulder pain, along with locking of her third digit on her right hand. Plaintiff reported difficulty sleeping and depression. The musculoskeletal system exam revealed only muschle spasm in the bilateral trap muscle of the cervical spine and general/bilateral muscle tenderness. Dr. Ali

assessed osteoarthritis, trigger finger of the right middle finger, and subacute sensory neuropathy. (Tr. 270-72)

Plaintiff returned to Dr. Ali on April 1, 2008, complaining of pain in right shoulder, which felt fine after taking a muscle relaxer. Dr. Ali noted that an EMG/NCV done two weeks prior revealed no evidence of nerve or muscle damage. Plaintiff also complained of right upper back pain and bilateral mid axillary pain around her shoulders. However, she was reluctant to take daily medications. Dr. Ali assessed osteoarthritis and encouraged Plaintiff to take her medication and exercise daily. (Tr. 334-37, 349)

On April 24, 2008, progress notes from Jewish Family and Children's Services indicated that Plaintiff had plenty of Celexa and Klonopin left despite not being seen since October of 2007. Plaintiff reported that her depressed mood was on an intermittent basis. The diagnosis included history of Major Depressive Disorder, severe without psychosis. The examiner noted that Plaintiff was experiencing depressive symptoms in the context of what appeared to be noncompliance with medications. Plaintiff was told to continue her medications and take them on a daily basis. (Tr. 396)

On May 20, 2008, Plaintiff reported having a good week after a mostly bad week. She helped care for her aunt for 4 days, which made her feel good because she was useful. She wanted to volunteer but was advised it would hurt her chances of obtaining disability. The examiner assessed a history of Major Depressive Disorder and noted that Plaintiff was doing relatively well, possibly related to resuming Celexa and Klonopin. An off service note indicated a possibility of post-traumatic stress disorder. Plaintiff was encouraged to continue psychotherapy. (Tr. 394-95) Dr. Jay L. Liss diagnosed depression on June 5, 2008. (Tr. 323-24)

During a June 24, 2008 follow-up appointment with rheumatology at Saint Louis

9

ConnectCare, Plaintiff reported that the pain in her joints was a 5 out of 10. She also complained of pain around her breast, which she rated an 8. Dr. Ali noted improved pain control in Plaintiff's outer hips and joints with less tingling and numbness. However, Plaintiff also complained of poor sleep due to pain and poor exercise habits. She was doing weight bearing exercises and walked at least 4 times a week. Review of systems revealed outer hip pain bilaterally and intermittent triggering in her left hand, as well as sensory disturbances bilaterally with tingling and numbness. Range of motion was 5/5 bilaterally in both the upper and lower extremities with no muscle tenderness. Plaintiff's mood was anxious and tearful. Dr. Ali's assessment included Vitamin D deficiency, obesity, and osteoarthritis. (Tr. 327-32)

Progress notes from Jewish Family and Children's Services reveal that on July 7, 2008, Plaintiff's diagnosis was history of Major Depressive Disorder in partial remission, rule out post-traumatic stress disorder. Plaintiff reported that she had a good week but was not sleeping well because she ran out of medication. She also stated that over a week prior to her appointment, she experienced decreased energy and suicidal thoughts with no plan. (Tr. 393) On August 25, 2008, Plaintiff reported that she was still depressed but had good days and bad days. Her bad days resulted in crying spells and episodes of staying bed for 2-3 days. The assessment included Major Depressive Disorder without psychosis, recurrent, severe, in partial remission, rule out post-traumatic stress disorder. The examiner increased Plaintiff's dose of Celexa. (Tr. 392)

On September 3, 2008, Amethyst Taylor completed a Mental Residual Functional Capacity questionnaire. Ms. Taylor stated that she saw Plaintiff approximately every two weeks over the past year. Ms. Taylor reported that Plaintiff's Multiaxial Evaluation included Major Depression; Diabetes and high blood pressure; and a current GAF of 60. Plaintiff responded well to treatment, as evident

10

in her decrease in depressive mood. Plaintiff's medications included Trazadone, Celexa, and Clonazepam, and she reported dizziness, drowsiness, fatigue, lethargy, stomach aches, and agitation as side effects from those medications. Ms. Taylor opined that with treatment, Plaintiff could get better. Plaintiff's signs and symptoms included mood disturbance, persistent disturbances of mood or affect, emotional withdrawal or isolation, and easy distractibility. (Tr. 317-18)

With regard to Plaintiff's ability to perform unskilled work, Ms. Taylor opined that Plaintiff was unable to meet the competitive standards of maintaining regular attendance, completing a normal workday and week without interruptions from psychologically based symptoms, and dealing with normal work stress. In addition, she was seriously limited but not precluded from remembering work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining attention for 2-hour segments; making simple work-related decisions; and accepting instructions and responding appropriately to criticism from supervisors. Plaintiff possessed a limited but satisfactory ability to perform all other unskilled work requirements. Ms. Taylor based her assessment on Plaintiff's report. (Tr. 319)

Ms. Taylor also stated that Plaintiff was unable to meet competitive standards for dealing with stress of semiskilled and skilled work. She was seriously limited, but not precluded, in understanding and remembering detailed instructions and setting realistic goals or making plans independently of others with regard to semiskilled and skilled work. She had either unlimited or limited but satisfactory abilities to interact with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation. (Tr. 320)

Further, Ms. Taylor opined that Plaintiff's impairments would cause her to miss work more

11

than four days per month. Plaintiff's long term mental issues included problems with concentration, completion of assignments/tasks, socialization, and depressed mood exacerbated by stress and anxiety. (Tr. 321)

### **IV. The ALJ's Determination**

In a decision dated October 30, 2008, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. She had not engaged in substantial gainful activity since March 1, 2006, her alleged onset date. The ALJ determined that Plaintiff's severe impairments were obesity, osteoarthritis, and major depressive disorder. However, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 10-12)

After carefully considering the record, the ALJ found that Plaintiff had the residual functional capacity (RFC) to lift and/or carry 20 pounds occasionally and 10 pounds frequently, and to sit, stand and/or walk, with usual breaks, for about 6 hours in an 8-hour workday. She was limited to unskilled work but was able to understand, remember, and carry out simple, routine, and repetitive work involving simple 1 and 2 step instructions and non-detailed tasks. Plaintiff could also maintain concentration and attention in 2-hour segments over an 8-hour period; demonstrate adequate judgement; and make adequate decisions. However, Plaintiff was unable to perform any past relevant work. (Tr. 13-15)

In light of Plaintiff's closely approaching advanced age, high school education, work experience, and RFC, the ALJ determined that a significant number of jobs existed in the national economy which Plaintiff could perform. Specifically, the ALJ found that Plaintiff could perform work at the light exertional level, as directed by the Medical-Vocational Guidelines. Further, Plaintiff's

nonexertional impairments had little or no effect on the occupational base, rendering a finding of "not disabled" appropriate. Thus, the ALJ concluded that Plaintiff had not been under a disability from March 1, 2006 through the date of the decision. (Tr. 15-16)

### V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the

13

evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler,

14

complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## **VI. Discussion**

Plaintiff argues that the ALJ erred in that he failed to properly consider Plaintiff's RFC and failed to utilize a vocational expert ("VE") in determining that Plaintiff was capable of performing work. Defendant contends that the ALJ properly assessed Plaintiff's RFC and properly relied on the Medical-Vocational Guidelines ("Grids"). Specifically, Defendant asserts the ALJ's analysis of Plaintiff's credibility and the medical evidence was proper. In addition, Defendant maintains and that vocational testimony was unnecessary in light of the ALJ's finding that Plaintiff had no significant non-exertional impairments which would prevent her from performing unskilled work. The undersigned agrees with the Plaintiff's argument that the ALJ's determination is not supported by substantial evidence because the ALJ failed to utilize a VE in light of Plaintiff's non-exertional impairments. The ALJ found that Plaintiff had severe impairments, including obesity, osteoarthritis, and major depressive disorder. (Tr. 10) In reaching the decision that Plaintiff could perform the full range of light work, the ALJ relied on the Grids instead of consulting a VE. Specifically, the ALJ found that Plaintiff's non-exertional limitations had little or no effect on the light occupational base, rending appropriate the reliance on the Grids. (Tr. 16)

An ALJ may rely on the Grids to find a plaintiff not disabled where the plaintiff does not have non-exertional impairments or where the non-exertional impairment does not diminish the plaintiff's

---

739 F.2d 1320, 1322 (8th Cir. 1984).

15

RFC to perform the full range of activities listed in the Grids. Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001) (citing Holz v. Apfel, 191 F.3d 945, 947 (8th Cir. 1999)). "However, when a claimant is limited by a non-exertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Grids and must instead present testimony from a vocational expert to support a determination of no disability." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). "Nonexertional limitations 'affect an individual's ability to meet the nonstrength demands of jobs,' Social Security Ruling 96-4p, 1996 WL 37418, *1 (1996), 'that is, demands other than sitting, standing, walking lifting, carrying, pushing or pulling[.]'" Sykes v. Astrue, No. 4:06cv1732 TCM, 2008 WL 619216, at *19 (E.D. Mo. March 3, 2008) (quoting 20 C.F.R. § 404.1569a(a)). Non-exertional limitations include difficulty functioning due to pain, nervousness, anxiety, or depression. See 20 C.F.R. § 404.1569a(c).

Here, the ALJ determined that Plaintiff's non-exertional impairment of depression had little or no effect on the occupational base at the light exertional level. The ALJ did not discuss Plaintiff's obesity and its affect on her ability to work. However, the medical records do not support this finding. Plaintiff received ongoing mental healthcare at the Jewish Family and Children's Services for depression, along with prescriptions for psychotropic drugs. Further, Plaintiff was frequently tearful and consistently reported bad days and weeks which included crying spells. (Tr. 234-38, 263-64, 392-96)

While Plaintiff's depression may not preclude her from performing all work, her nonexertional impairment is significant enough to warrant VE testimony. As previously stated, the ALJ found that although Plaintiff's ability to perform work at the light exertional level was compromised by nonexertional limitations, the limitations had "little or no effect" on the occupational base. However,

16

although an ALJ may rely on the Grids where nonexertional impairments do not significantly diminish a plaintiff's RFC to perform the full range of activities, "'persistent nonexertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled.'" Sieveking v. Astrue, No. 4:07CV986 DDN, 2008 WL 4151674, at *6 (E.D. Mo. Sept. 2, 2008) (quoting Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997)). The ALJ's reliance on the Grids contradicts not only the RFC finding, which specifically includes mental limitations, but also the initial finding that Plaintiff's depression is "severe." See Sieveking, 2008 WL 4151674, at *7 (remanding case for VE testimony where ALJ included plaintiff's avoidance of complex work in the RFC).

Because the record demonstrates that Plaintiff's ability to perform the full range of light work is significantly compromised by her non-exertional limitations, the ALJ was required to consult a VE regarding the effects those limitations have on the availability of work. See Beckley v. Apfel, 152 F.3d 1056, 1060 (8th Cir. 1998). In addition, the ALJ failed to take into account Plaintiff's severe impairment of obesity. According to the Eighth Circuit Court of Appeals, "[o]besity is also a nonexertional impairment which might significantly restrict a claimant's ability to perform the full range of [ ] work." Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997). A VE should consider the impact of this nonexertional limitation on Plaintiff's ability to work as well. Id.

Therefore, the undersigned finds that the ALJ erred in erroneously applying the Grids and in failing to elicit testimony from a VE regarding Plaintiff's ability to perform work existing in significant numbers in the national economy, despite Plaintiff's severe nonexertional impairments of obesity and depression. As a result, substantial evidence does not support the ALJ's conclusion that Plaintiff was not disabled. Lucy, 113 F.3d at 909. Therefore, the Commissioner's decision should be reversed and

remanded to the ALJ to adduce testimony from a VE regarding Plaintiff's nonexertional impairments and their impact on her ability to perform jobs in the national economy. See <u>Yeley v. Astrue</u>, No. 1:07CV148 LMB, 2009 WL 736701, at *13 (E.D. Mo. March 18, 2009). Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with the above.

/s/ Terry I. Adelman<br>UNITED STATES MAGISTRATE JUDGE

Dated this  22nd   day of September, 2010.